T.C. Memo. 1997-37


UNITED STATES TAX COURT


JAMES D. SCHLICHER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21305-94.            Filed January 21, 1997.


Jon R. Vaught, for petitioner.

Jeremy McPherson, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined a deficiency in, and additions to, petitioner's Federal income tax for the taxable year 1988 as follows:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6654 |
| 1988 | $98,917 | $24,729.25 | $6,326.15 |

After concessions by the parties,[1] the only issue for decision is: Whether pursuant to section 1034(a), petitioner may defer recognition of the gain from the sale of his principal residence in Livermore, California, in excess of the amount allowed by respondent.[2] We hold he may as set out below.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. At the time the petition in this case was filed, petitioner resided in Clayton, California.

For 1988, petitioner did not file a Federal income tax return, nor did he pay any Federal income tax for that year, either through withholdings or estimated tax payments. In 1988, petitioner had taxable interest income of $13,416. On December 31, 1988, petitioner was unmarried, and he did not have any dependents. To calculate the deficiency in issue, respondent used the rate applicable to single persons.

[1] For 1988, the taxable year in issue, petitioner concedes that he is liable for additions to tax under secs. 6651(a) and 6654(a), computed on any deficiency in tax for which we determine he is liable.

Both parties concede that each of the 51 acres of the Clayton property purchased by the petitioner should be considered to be of equal value.

[2] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

In 1975, petitioner purchased a principal residence (the Livermore residence) and approximately 5 acres of land in Livermore, California (the Livermore property) for $52,000. The Livermore residence was approximately 1,000 square feet in size, and there were several small farm structures on the property. Between 1975 and 1988, petitioner made $25,000 in capital improvements to the Livermore residence, and $25,000 in capital improvements to the farm structures. Petitioner's total adjusted basis in the Livermore residence, farm structures, and 5 acres of land was $102,000.

While living on the Livermore property, petitioner operated a mobile farrier (horse-shoer) business out his 1984 Dodge pickup truck, which was equipped with a horse-shoeing camper. Although petitioner parked his truck on the property he did not operate the farrier business on the Livermore premises. In 1988, petitioner received gross receipts from his farrier business of $37,088,[3] and paid deductible business expenses of $49,542.

Petitioner also operated a horse boarding and breeding business on pasture land that he leased from neighbors. At any given time, petitioner boarded approximately 30 horses for clients on the leased premises. In addition, petitioner kept one stallion, approximately 6 brood mares, and 6 colts on the leased premises, which he owned and used in his horse breeding business. Petitioner did not use these horses for personal purposes.

---

[3] Petitioner's gross receipts from this activity are referred to in the notice of deficiency as "Schedule C gross receipts."

Petitioner did not use any of the Livermore property for business purposes. In 1988, petitioner received gross receipts from his horse boarding and breeding business of $28,188,[4] and paid deductible business expenses of $47,752. Petitioner owned some personal horses that he rode for pleasure, which he kept on the 5 acres used as his Livermore residence. Petitioner had a fence around the 5 acres, corrals that were used to exercise his personal horses, and a barn used for boarding. Petitioner did not allow any of the boarded horses in the area where he kept his personal horses.

On July 18, 1988, petitioner sold the Livermore residence and the 5 adjoining acres for $550,000. He incurred $29,000 in sale expenses. Thus, the adjusted sales price was $521,000, and petitioner's total adjusted basis was $102,000. Therefore, petitioner realized a gain from the sale of $419,000.

In December of 1988, petitioner purchased 51 acres of undeveloped land in Clayton, California (the Clayton Property), for $380,000. The property is comprised of an upper, steeply-hilled wooded area and a plain. The upper portion of the property, which is zoned for residential building has a better view of the surrounding countryside and of Mount Diablo than does the plain. The plain, where petitioner's boarding facility is located, consists of a 100-year flood zone. This area is also a Native American archaeological site; therefore, petitioner is

[4] Petitioner's gross receipts from this activity are referred to in the notice of deficiency as "Schedule F gross receipts."

legally precluded from constructing any residential buildings on this portion of the property.  However, petitioner is permitted to build agricultural structures on this portion of the land.

Within the 2-year period following the date of sale of the Livermore residence, petitioner incurred expenses of $146,922 to construct a residence, garage, and a barn on the Clayton property, which he used for personal purposes.  In this same time period, petitioner spent substantial amounts of money to construct buildings for use in his boarding and breeding business.

While living on the Clayton property, petitioner continued to work as a farrier and to board and breed horses.  Petitioner concedes that he operated his horse boarding and breeding business on 7-½ acres of the Clayton property after the purchase. At any given time, petitioner boarded an average of 30 horses on the Clayton property, approximately the same number of horses that he boarded on the leased premises in Livermore.  Petitioner fenced off the horse boarding and breeding facility from the remainder of the Clayton property using special fencing safe for horses.  In the fenced area there is a 20-stall barn and paddocks (an enclosed area used for pasturing or exercising horses).  Not all of the boarded horses are kept in the stalls; some of them stay in the fenced areas outside, while others remain in the paddocks.

Petitioner does not train horses on his premises, nor does he give lessons or offer horseback riding facilities. In fact, access to the riding trails from the Clayton property is obstructed by the presence of Mount Diablo. If a boarding client wants to train, ride, or exercise a horse the client must transport the animal to another facility in the area. The business portion of the Clayton premises is not used for anything other than breeding and boarding horses.

While petitioner has several personal horses that are generally located on the portion of the Clayton property not used for business, occasionally he puts them with the boarded horses. At no time, however, are the boarded horses permitted on the residential portion of the Clayton property.

When petitioner moved to Livermore it was substantially less congested than it had become by the time petitioner sold the property in 1988. By 1988, petitioner could no longer keep many horses on the property. During this time, petitioner was also having problems with his neighbors who were throwing cat litter over his fence. In addition, petitioner became increasingly concerned about liability issues, because children in the neighborhood would climb over his fence and get too close to his personal horses. Petitioner finally decided to sell the Livermore property when one of these children got onto his property and turned some of the horses loose.

When petitioner decided to purchase the Clayton property, he did not do so because it would be conducive to his business operations. Had this been petitioner's primary consideration, he would have bought level land, rather than property consisting of a steeply hilled area and a flood zone of archaeological importance. In fact, when looking for a new residence, petitioner's first priority was to find a piece of property on which he could live out "the rest of his life." Petitioner enjoys living in Clayton, because it is a secluded rural area where he can be close to nature. He also likes being in the country where the houses are not close together, and where he does not have to contend with less than congenial neighbors.

Petitioner lived with his girlfriend, Patsy Lyons, at both the Livermore and the Clayton residences. Each of them rides horseback and has ridden petitioner's personal horses on the steeply-hilled portion of the Clayton property, and on the plain. Petitioner uses the upper wooded area for hiking. There is also a dirt road that goes up the steeply hilled portion of the property, which is accessible by car, horse, and foot. During the springtime, petitioner's personal horses graze up there to keep the grass down. Petitioner never allows the horses from his boarding or breeding business to use this area. Petitioner keeps all 51 acres of the Clayton property fenced off from neighboring houses.

When petitioner originally constructed his residence on the Clayton property, he was considering building it in the upper wooded area. However, because that area needed extensive clearing, petitioner would not have been able to prepare the site and build a house within the 2-year period required by law. Instead, petitioner built his residence above the plain on a cleared plateau, which abutted the upper, steeply hilled section of the Clayton property.

## OPINION

Respondent determined a deficiency against petitioner for 1988 of $98,917, and additions to tax under sections 6651(a) and 6654(a) of $24,729 and $6,326, respectively. These deficiencies were based on respondent's determination that petitioner had capital gains from the sale of his principal residence in Livermore, California, because petitioner failed to establish how much of the 51 acres of the new property, which he purchased in Clayton, California, was used by him as his principal residence.[5] Petitioner asserts that he used only 7-½ of the 51 acres of the Clayton property for his horse boarding and breeding business, that the remaining land was used as his principal residence, and therefore that his investment therein qualifies for nonrecognition treatment under section 1034(a).

---

[5] In the notice of deficiency, respondent failed to allocate any portion of the 51 acres of the Clayton property to petitioner's residence. However, at trial, respondent concedes that 1 acre out of the 51 acres was used by petitioner as his principal residence.

Under the general rule of section 1001(c),[6] petitioner is required to recognize the gain on the sale of the Livermore property. However, pursuant to section 1034(a),[7] a taxpayer may defer gain from the sale of a principal residence provided such gain is rolled over to a new principal residence within the time prescribed in the statute. Section 1034(a) provides that a taxpayer must recognize gain from the sale of his principal residence only to the extent the adjusted sales price[8] of that

-----

[6]    Sec. 1001(c) provides in pertinent part as follows:

(c) Recognition of Gain or Loss.--Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

[7]    Sec. 1034(a) provides in pertinent part as follows:

(a) Nonrecognition of Gain.--If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 2 years before the date of such sale and ending 2 years after such date, property (in this section called "new residence")is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

[8]    Sec. 1034 (b) provides in pertinent part as follows:

(b) Adjusted Sales Price Defined --

(1) In general--For purposes of this section, the term "adjusted sales price" means the amount realized, reduced by the aggregate of the expenses for work performed on the old residence in order to assist in its sale.

(2) Limitations--The reduction provided in paragraph (1) applies only to expenses--

(continued...)

residence exceeds the cost of property purchased and used as a new principal residence within 2 years before or after the date of sale. Moreover, where part of the new residence purchased is used as the taxpayer's principal residence and part is used for business purposes, only the portion of the cost allocable to the residential use is entitled to section 1034(a) nonrecognition. Beckwith v. Commissioner, T.C. Memo. 1964-254; Grace v. Commissioner, T.C. Memo. 1961-252; sec. 1.1034-1(c)(3)(ii), Income Tax Regs. Thus, pursuant to section 1034(a) and the regulations thereunder, only the portion of the Clayton property used by petitioner as his principal residence during the 2-year period following the sale of the Livermore property may be included in the cost of purchasing such residence. Whether or not property is used by a taxpayer as his residence depends upon all the facts and circumstances in each case, including the good faith of the taxpayer. Thomas v. Commissioner, 92 T.C. 206, 243 (1989); sec. 1.1034-1(c)(3)(i), Income Tax Regs.

---

[8](...continued)
    (A) for work performed during the 90-day period ending on the day on which the contract to sell the old residence is entered into;
    (B) which are paid on or before the 30th day after the date of the sale of the old residence; and
    (C) which are--
       (i) not allowable as deductions in computing taxable income under section 63 (defining taxable income), and
       (ii) not taken into account in computing the amount realized from the sale of the old residence.

To carry his burden of proof, thus entitling petitioner to the nonrecognition benefits of section 1034, he must prove that he has satisfied all of the section's requirements. Rule 142;[9] Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995).

---

[9] At trial and on brief, petitioner asserts that respondent's notice of deficiency was arbitrary and excessive and not entitled to a presumption of correctness, thus shifting the burden of proof to respondent where, in determining the deficiencies for the taxable year in issue, respondent failed to allow for the cost of any of the replacement real property in Clayton, California. To support his position, petitioner relies on such cases as Herbert v. Commissioner, 377 F.2d 65, 69 (9th Cir. 1966), revg. T.C. Memo. 1964-223; Jackson v. Commissioner, 73 T.C. 394, 401 (1979); and Dellacroce v. Commissioner, 83 T.C. 269 (1984). However, petitioner's reliance on this line of cases is misplaced.

It is well settled that the Commissioner's determinations in a notice of deficiency generally are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995). However, a showing that the statutory notice is arbitrary and excessive within the rule of Helvering v. Taylor, 293 U.S. 507 (1935), may have the effect of shifting the burden of going forward to respondent. Jackson v. Commissioner, supra.

As a general rule, this Court will not look behind the statutory notice of deficiency to examine the evidence used in making the determination. Jackson v. Commissioner, supra at 400. On rare occasions, however, we have recognized an exception to the foregoing rule in cases involving unreported income, where the respondent introduced no predicate evidence but rested on the presumption of correctness and the petitioner challenged the notice of deficiency. Dellacroce v. Commissioner, supra at 280 citing Jackson v. Commissioner, supra; Delaney v. Commissioner, T.C. Memo. 1982-666, affd. 743 F.2d 670 (9th Cir. 1984).

Petitioner contends that his case is governed by the exception rather than the general rule. We disagree. Respondent's determination is not based on petitioner's alleged unreported income. Therefore, petitioner does not fall within the exception described above. Accordingly, the burden of proof rests with the petitioner. Rule 142(a).

Petitioner sold the Livermore residence and adjoining 5 acres for an adjusted sales price of $521,000, and realized a gain from the sale of $419,000.  Under the provisions of section 1034(a), petitioner must recognize such gain to the extent that the portion of the cost of the Clayton residence, which is allocable to residential use, is less than $521,000.  Petitioner purchased 51 acres of undeveloped land in Clayton, California for $380,000.  He also spent $146,922 to construct a residence, garage, and barn.  There is no dispute that the Livermore residence and adjoining 5 acres are to be treated as residential in their entirety.  Moreover, the parties agree that the gain realized from the sale of the Livermore property, to the extent attributable to the portion of the Clayton property used for petitioner's horse boarding and breeding business, does not qualify for section 1034(a) nonrecognition.  However, where the parties diverge is with respect to the number of acres of the Clayton property that petitioner used as his residence.  In making an allocation between residential and business use, we note that neither the statute, nor the applicable regulation, nor case law provides a specific method for determining what portion of a realized gain is attributable to the nonresidential use of the new residence.  Section 1.1034-1(c)(3)(ii), Income Tax Regs., merely states that "an allocation must be made."  Wigfall v. Commissioner, T.C. Memo. 1982-171.

In support of her position that petitioner used only 1 acre of the Clayton property as his residence, respondent heavily relies on Beckwith v. Commissioner, T.C. Memo. 1964-254. We do not agree that Beckwith is controlling in light of the facts of the instant case.

In Beckwith, the taxpayer purchased approximately 80 acres of land, built a residence on the property, and asserted that the portion of the land not used for business must necessarily be regarded as his residence. Respondent contends that the facts in Beckwith, are closely analogous to the facts at issue here. We disagree. In Beckwith, nearly 40 of the 80 acres purchased by the taxpayer were held in reserve under a soil conservation contract with the U.S. Department of Agriculture and approximately 28 acres consisted of marshland and some wooded area. With respect to the land held in reserve by the United States, we found that the taxpayer's residence could not reasonably be said to include these acres.

In the case at bar, however, there is no restriction on petitioner's right to use all 51 acres of his land, except to the extent that he is precluded from building residential structures on the flood plain because of its archeological importance. Petitioner may build, and has indeed built, agricultural structures on such property. Moreover, petitioner uses a portion of this area for his boarding and breeding business. With respect to the wooded area in Beckwith, we held that this was not

part of the residence, noting that the taxpayer had used some of this area to conduct helicopter experiments, which detracted from its characterization as a residence. More importantly, the taxpayer in Beckwith only regarded the house itself and 5 appurtenant acres as his residence. However, in the instant case, the petitioner regards and uses all of the Clayton property as his residence, except for the portion allocated to his business. At trial, the petitioner repeatedly and unequivocally testified that he moved to the Clayton premises, because he appreciates nature, admires unobstructed views of the countryside, enjoys living in open spaces where he can hike and ride horseback, and ultimately desires to live the rest of his life there. We find petitioner's testimony to be credible.

On brief, the respondent relies on Grace v. Commissioner, T.C. Memo. 1961-252, for the proposition that occasional or insignificant use of property, such as for storage of business tools, is not sufficient to determine its character as business property. In Grace, we found a taxpayer's business use of his residence to be "insignificant," where he merely stored construction tools in part of his basement. Accordingly, we held that an allocation between the business and residential use was not required for purposes of section 1034(a) nonrecognition. Respondent, treating the instant case as the converse of Grace, contends that the petitioner here used the upper, steeply hilled section of the Clayton property only "insignificantly," and thus

such use was insufficient to constitute residential use as required by section 1034(a).

We find that respondent's reliance on Grace is misplaced. In Grace we concluded that a taxpayer's storing business tools in the basement of his home was insignificant business use, so that no allocation was required for purposes of section 1034 and the regulation thereunder. However, it does not follow that petitioner's use of the upper, steeply hilled portion of his property was so insignificant as to establish that it was not used by him as his residence. Moreover, we do not believe that petitioner's use of this area was insignificant.

Petitioner and his girlfriend, Patsy Lyons, have used the upper, steeply hilled portion of the Clayton property for horseback riding, hiking, walking, and simply to enjoy the unobstructed view of the countryside and Mount Diablo. During the springtime petitioner's personal horses graze up there. When petitioner originally built his principal residence on the Clayton property, he was considering building it in the upper wooded area. However, he chose not to do so, because he would not have been able to clear the area and build a house within the 2-year period of section 1034.

Based on the entire record, we find that petitioner's use of the upper, steeply hilled area was significant, and sufficient to constitute residential use. Cf. Grace v. Commissioner, supra.

Petitioner asserts that he used only 7-½ acres of the

Clayton property for business and that the remaining 43-½ acres were used as his residence. To support his position, petitioner relies on cases, such as Richards v. Commissioner, T.C. Memo. 1993-422 (respondent agreed that the taxpayer's homesite and 28.6 acres of dry pasture land constituted residential property); Estate of Campbell v. Commissioner, T.C. Memo. 1964-83 (where the taxpayer's residence is part of a property also used for business, nonrecognition applies not only to the home itself, but to the environs and outbuildings relating to the dwelling unit); and Bennett v. United States, 61-2 USTC par. 9697, 8 AFTR2d 5593 (N.D. Ga. 1961) (the taxpayer's residence included an entire 65-acre tract, rather than the 2-½ acres determined by respondent). We agree with petitioner.

At trial, petitioner testified that at any given time, he boarded an average of 30 horses on the Clayton premises, which was approximately the same number of horses that he boarded in Livermore. Petitioner kept these horses fenced off from the remainder of the Clayton property using special fencing safe for horses. In the fenced area there is a 20-stall barn and paddocks. Petitioner keeps some of the boarded horses in the stalls, some in the fenced areas outside, while others remain in the paddocks. At trial, petitioner testified, and we find as fact that the boarded horses were never allowed on the upper section of the property. The testimony of Mr. Vogel, the revenue agent called as a witness for respondent, supports petitioner's testimony. At

trial, Mr. Vogel, who had been to the Clayton property more than a half of a dozen times, testified that he never saw any horses on the upper, steeply hilled portion of the Clayton property.

Petitioner testified that he does not train horses on his premises, nor does he give riding lessons or offer horseback riding facilities.  Access to the riding trails from the Clayton property is obstructed by the presence of Mount Diablo; therefore a boarding client who wants to train, ride, or exercise his or her horse must transport the animal to another facility in the area.  Furthermore, because petitioner uses the business portion of the Clayton premises solely for breeding and boarding horses he needs less land for such business, than, for example, someone who operates a horse training and horseback riding facility.

Finally, we mention in passing that the good faith of a taxpayer is taken into account in determining whether or not property is used by a taxpayer as his residence.  Thomas v. Commissioner, 92 T.C. 206, 243 (1989); sec. 1.1034-1(c)(3)(i), Income Tax Regs.  In assessing petitioner's credibility we note that we were influenced by the testimony of  Mr. Vogel, the revenue agent who was called as witness for respondent.  At trial Mr. Vogel testified that petitioner's girlfriend and bookkeeper, Patsy Lyons, spent a substantial amount of time with him reconstructing petitioner's records.  Moreover, the agent testified that both she and the petitioner were very cooperative and that he had "complete faith that what she was telling * * *

[him] was correct."  Given that the petitioner is a credible witness and based on the entire record we find that petitioner used only 7-½ of the 51 acres of the Clayton property for business.

On brief, respondent argued in the alternative that the remaining 43-½ acres of the Clayton property not used for business were held by petitioner for investment.  Respondent contends that the upper, steeply hilled portion of the Clayton property, which is zoned for residential use, could be divided into home sites that petitioner could then sell for a profit. Respondent points to the fact that petitioner had a 280-foot well drilled on one of the home sites for future use as evidence that petitioner held this portion of the Clayton property for investment.  We disagree.

Before building his current residence, petitioner drilled a well on the upper, steeply hilled portion of the land to make sure that he "could hit water."  However, petitioner decided it was more practical to build elsewhere on the site.  Whatever desire petitioner had to build on the upper portion was abandoned when he built his current residence, and remains no more than a vague dream.  Moreover, petitioner enjoys solitude and credibly testified that he did not purchase the Clayton property for investment purposes, but rather as a place where he could live "the rest of his life," untroubled by close neighbors.

Accordingly, we find that petitioner held the remaining 43-½ acres as his residence and not for investment. Residential purposes may include appreciating nature, living in open spaces, hiking, horseback riding, and enjoying unobstructed views of the countryside.  In fact, this is quite common in the Western portion of our country, as in Clayton, California, where land is more plentiful.  Nothing in section 1034 prohibits us from finding that such use constitutes "significant use" for residential purposes.  Accordingly, we find that petitioner has met his burden of proving that he used the remaining 43-½ acres of the Clayton property as his residence.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.